Robert HAWKINS, Appellant,

v.

John E. BENNETT, Warden Iowa State Penitentiary, Fort Madison, Iowa, Appellee.

No. 52576.

Supreme Court of Iowa.

July 18, 1968.

———◆———

Robert Hawkins, pro se.

Richard C. Turner, Atty. Gen., William A. Claerhout, Asst. Atty. Gen., and Thomas E. Tucker, Johnson, Phelan & Tucker, Fort Madison, for appellee.

SNELL, Justice.

This is an appeal from denial of plaintiff's petition for writ of habeas corpus.

Robert Hawkins pleaded guilty to murder in the first degree. He was sentenced to life imprisonment. After 40 years in the penitentiary he challenged the legality of his confinement. We have been furnished and have examined the records from Johnson County where he was sentenced and the records and transcript of the evidence in Lee County from which this appeal comes to us.

From the records of Johnson County we learn that during the era of the "noble experiment" an oasis for the thirsty known as "Black Edna's" flourished in Iowa City. Liquor, poker and dice games and other activities were available and well patronized by both black and white customers.

On the evening of May 1, 1926 and continuing into the early hours of May 2 the place was jumping with activity but unfortunately complete harmony did not prevail. Hawkins was somewhat belligerent. Some of the games of chance were interrupted and then resumed. Following a dispute in a dice game over whether he had thrown a number 10 and made his point Hawkins left the room. He returned shortly armed with an ax. He chopped a Mr. Blair on the back of the head several times with the ax. Mr. Blair died as a result.

Mr. Hawkins was arrested and taken to jail.

The grand jury investigated and took testimony for several days. Thirty-eight witnesses, including a number of eye witnesses, were examined and the minutes of their testimony are attached to the indictment. On May 15, 1926 Hawkins was indicted and charged with murder in the first degree.

It would appear obvious from a look at the evidence available to the state that the accused faced formidable problems about what to do. Capital punishment was a possible penalty. The county attorney "was not entirely sold on capital punishment," and although there is nothing in the record to show that the accused or his attorneys knew what would happen the presiding judge was opposed to capital punishment.

On May 17 Hawkins appeared in court for arraignment, in person and with his attorneys, Hon. Ingalls Swisher and Mr. Edward F. Rate, both competent and experienced attorneys.

The record shows that Hawkins was duly and formally arraigned and entered a plea of guilty as charged and waived time for pronouncement of judgment.

The enrolled order then says:

"And this being the day and the hour fixed by the court for the taking of the evidence, as by the statute contemplated, the court proceeds to take the evidence introduced thereon, and thereupon the court having heard the evidence proceeds to enter judgment and pronounce sentence, as by the statute contemplated. The defendant, Robert Hawkins, is asked by the court if he has any legal reason to offer why sentence should not now be pronounced, and no sufficient cause being shown, it is therefore

"Ordered, adjudged and found that the defendant, Robert Hawkins, be and he is hereby committed to the State Penitentiary at Fort Madison, Iowa and confined therein at hard labor for the period of his natural life, for murder in the first degree, and that he be not allowed any bail on appeal."

Mittimus was issued and he was delivered to the penitentiary on May 19, 1926.

On July 22, 1966, more than 40 years after his commitment, Robert Hawkins, plaintiff herein, filed in the district court of Lee County a petition for Writ of Habeas Corpus. He listed 28 grounds and 12 additional subgrounds for granting the writ. Support was sought from the citation of many authorities. At the request

of petitioner the matter was continued three times and finally heard on December 30, 1966.

Nowhere in the record do we find any claim or suggestion that he was not guilty.

I. By statute, section 663.34 the issues in habeas corpus "shall be tried by the judge or court."

■■■ The case before us differs from habeas corpus cases to determine custody of minor children. Our review here is not de novo. Gibson v. Lainson, 244 Iowa 1396, 1398, 60 N.W.2d 797. The burden rested on petitioner to prove his case by a preponderance of the evidence and the trial court's findings are binding on us if supported by substantial evidence. Herold v. Haugh, 259 Iowa 667, 669, 145 N.W.2d 657.

■■ II. The trial court found and we agree that the many complaints of petitioner are repetitious and actually are as follows:

"1. That he was held incommunicado without counsel from May 2, 1926 until May 15th, 1926.

"2. That his plea of guilty was coerced.

"3. That he was inadequately represented by counsel.

"4. That a hearing was never held to determine the mitigation of the offense."

The court then said:

"The court finds that the court appointed two competent attorneys to represent the petitioner after he was arrested. The court finds that there is no evidence that he was coerced into a guilty plea by the court or by his counsel. The court further finds that a hearing was held to determine any facts in mitigation or in aggravation of the offense."

The court annulled the writ and returned petitioner to the custody of the warden. We affirm.

III. We have before us the transcript of the hearing in habeas corpus. It appears that petitioner was treated with courtesy and consideration. He was granted every continuance requested. Before the hearing he stated he was ready to proceed. He was encouraged by the court to tell his full story. This is shown by the questions asked by the court.

"Q. Now, would you just state to the court the facts which occurred back in 1926 that you complain about in your petition, which was filed on July 22, 1966? Would you just tell me the story. Tell me what you are complaining about. What was done that you think violated your Constitutional rights as you set forth here in your petition. * * *

"Q. Well, explain that to me. Why didn't you have a fair trial? * * *

"Q. Just tell me the details of what exactly happened. What were you arrested for? * * *

"Q. And what happened at the police station? * * *

"Q. And now is there anything else you're complaining about?

*    *    *    *    *    *

"Q. Well, what are the facts that you complain about? See, those are conclusions of law that you are stating there. What are the facts which show that? I mean, you told me that you were arrested and not given an attorney and a confession was taken from you without an attorney. Now, is there anything else that you are complaining about. You were held until the 17th without seeing an attorney? * * *"

Petitioner claimed he was held in jail "without a defense of any kind and taken over and sentenced before the judge on May the 17th or 18th without an attorney or without a defense whatsoever." He said his sentence was not legal. "Natural life in prison without due process of law."

Pursuant to previous requests by petitioner for a continuance hearing had been set for November 18, 1966. Mr. Edward L. O'Connor, who had been county attorney of Johnson County in 1926 had been called to testify on November 18 in the Lee County hearing. At the request of petitioner the hearing was continued until December 30, 1966. Mr. O'Connor had not been notified of the changed date and appeared at Fort Madison Courthouse on November 18. To avoid an extra trip by Mr. O'Connor and with permission of the court his testimony was taken by deposition and then offered on December 30. Mr. Hawkins was present while Mr. O'Connor testified.

We quote excerpts from his testimony:

"Q. Mr. O'Connor, you have been an attorney in Iowa City for how long? A. Since 1920.

"Q. And are you acquainted, or have you in your professional capacity become acquainted with the petitioner here, Mr. Hawkins? A. Yes.

"Q. And in what capacity was that, Mr. O'Connor? A. As the County Attorney of Johnson County, Iowa, about the month of May, 1926. I became acquainted with the petitioner when he was brought into the City Jail at Iowa City, Iowa, on a charge of—The first charge that was brought was assault with intent to commit murder. His victim died four or five hours later; then the charge was changed to murder in the first degree, and at that time I became acquainted with the petitioner, Robert Hawkins.

"Q. And subsequent to that time, Mr. O'Connor, did the petitioner, here, Robert Hawkins, plead guilty to the specific crime of murder in the first degree? A. He did.

"Q. As specifically alleged in the Indictment? A. He did.

"Q. And were you present in the courtroom on the day that he entered that plea? A. I was.

"Q. Now, who represented Mr. Hawkins during the time between the time he was charged and the time he finally entered his plea? A. There were two attorneys approved by the Court to represent Mr. Hawkins. One was the Honorable Ingalls Swisher, who is now deceased, and the other attorney was Edward L. Rate.

"Q. And as I understand, Mr. Swisher represented him actually the day that he entered his plea? A. Yes, I am certain that Mr. Swisher was in court, and I am almost certain that Mr. Rate, both, were in court at the time that he was arraigned and entered his plea.

"Q. All right, now, just a minute. Now, Mr. O'Connor, at the time the defendant, here, or the petitioner, here, Robert Hawkins, entered his plea of guilty, was there any interrogation or any questioning by the court prior to the entry of sentence? A. Yes, there was.

"Q. And can you give us, to the best of your recollection, the general substance of that interrogation and questioning? A. Well, as I recall—of course its forty years ago—the judge asked Mr. Hawkins if he was charged in the Indictment in his true name. You want me to continue?

"Q. Yes, continue, please. A. And to which Mr. Hawkins responded that he was charged in his true name. And the judge then asked Mr. Hawkins if he was represented by legal counsel, and he said yes; and the judge asked if attorneys Swisher and Rate were his attorneys, and he said that they were; and then the judge asked him if he had received a true copy of the Indictment. Now, either he—Either Mr. Hawkins or his attorneys answered that he had received a true copy of the Indictment, and the Court then asked if he was ready to enter a plea, and either Mr. Hawkins or his attorneys said that he was ready. So,

then the judge asked what the plea was—is your plea guilty or not guilty—and, as I recall Mr. Hawkins said he, that he was guilty as charged in the Indictment. And then the Court asked the County Attorney if he was ready to present any evidence, evidence in support of the Indictment; and of course this is forty years ago, I think there were ten or twelve, maybe more, witnesses that had appeared before the Grand Jury. We didn't call all of the witnesses; I think we called three or four. One of those witnesses, I think his name was Grandrath, and he was the witness—I think he was working in the Johnson County Savings Bank at the time, and he had come down there with his date to get a drink at this place where the murder took place, and he was the gentlemen, the witness that, when he saw the, Mr. Hawkins hit Mr. Blair—I think that was the name of the victim—with an ax, hit him in the back of the head, he started to run out, and apparently Mr. Hawkins felt that he was running towards him, to attack him, so he swung the ax at this gentlemen, and he was so close—."

Petitioner interrupted to deny that witnesses were present "in the place when it happened" and that there was any testimony in the Judge's hearing. This claim is completely contrary to the official record.

Mr. O'Connor continued:

"A. Well, as I previously stated, I think it was this witness, Grandrath, that was running—he had to run towards Mr. Hawkins in order to get out the door, to get away—and he was so close to Mr. Hawkins that Mr. Hawkin's arms hit him in the body with—but the ax didn't hit this witness—but Mr. Hawkin's arms did, and knocked him out of that room into a side room, and then another witness that I recall—it was a colored gentlemen—I'm not sure, I think his name perhaps was Smith, I'm not too sure as to that—and another witness that I recall very well was Garret Byrne—he was an officer, police officer, the first officer to get there to the scene

of the crime, and I think he was the officer that took Mr. Hawkins down to the police station, and one of the doctors—he had a German name. I think he was the doctor that performed the post-mortem on the body of Mr. Blair. Doctor Houseman— I'm not altogether certain as to the pronunciation of that name, but as I recall it was a German name. * * *

"Q. And it is your recollection, specifically, that these people testified in open court between the time Mr. Hawkins entered his plea and the time the court sentenced him? A. That's right, * * *. Then I might say the—After the witnesses so testified, then the judge asked me, as County Attorney, if I had any statement to make, professional statement to make to the Court, and I told him that I did, and I made a professional statement. I reviewed the evidence. * * *

"Both—well, I take that back, I'm not sure—one of his attorneys, Mr. Swisher, also made a statement to the Court and asked the Court not to sentence this man to hang by the neck until dead, that he thought that there was some justifiable circumstances. They thought that because he was in the heat of passion, he got mad, he thought this other fellow was trying to cheat him, and recommended to the Court that the Court not grant capital punishment. * * *

We have no question here of in custody interrogation, coercion or confessions. The plea of guilty was made in open court. The court record shows petitioner was represented by two attorneys. There is no claim that they were incompetent. The record also shows that a proper hearing was had before sentence. Petitioner's complaint and statements in the form of conclusions reached after 40 years are not sufficient to impeach the record.

■ IV. As indicated by the foregoing the trial court granted a full evidentiary hearing. Petitioner appeared pro se and so appears here. From a study of the record

we are convinced that petitioner's complaints were so completely lacking in substance that no useful purpose would have been served by appointment of counsel. Attorneys, no matter how competent, cannot accomplish the impossible.

Petitioner on September 9 said he had written the Iowa Civil Liberties Union for counsel but had no reply. Hearing was continued and finally heard on December 30.

■ There is no constitutional right to appointment of counsel in all habeas corpus proceedings. See Bolds v. Bennett, Iowa, 159 N.W.2d 425, and authorities cited in special concurrence filed June 11, 1968.

■ V. The rules based on Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 do not apply to this case tried 40 years prior to the effective date thereof. State v. Hardesty, Iowa, 153 N.W.2d 464, 469.

■ VI. Petitioner said he was not advised of his right to appeal following his plea of guilty. We know of no rule requiring such advice 40 years ago and following a plea of guilty. We find no authority saying that the rules of procedure as now required should be retroactively applied.

Witherspoon v. State of Illinois, 391 U. S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, was decided June 3, 1968. This appears on page 1784: "Certainly long delays in raising objections to trial proceedings should not be condoned except to prevent intolerable miscarriages of justice. Cf. Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837." Although appearing as a footnote to a dissenting opinion it is appropriate to the case before us. We find nothing indicating any intolerable miscarriage of justice.

The case is

Affirmed.

All Justices concur.